UNITED STATES OF AMERICA
IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MICHIGAN, NORTHERN DIVISION
------------

UNITED STATES OF AMERICA,

Plaintiff,

v.

THOMAS DONALD TEEPLE,

Defendant.
_______________________________________/

Case No.: 2:04-cr-036

**Hon. R. Allan Edgar,**
**Senior United States District Judge**

**DEFENDANT'S SENTENCING MEMORANDUM**

**NOW COMES** the Defendant, Thomas Donald Teeple, by and through Assistant Federal Public Defender, Paul A. Peterson, and respectfully requests that the Court consider the following at the time of the imposition of sentence:

1. In over thirty years of criminal defense practice, in both federal and state courts, there is one thing counsel learned early, and it has continued to be true – the sentencing of a criminal defendant is the paramount event of our criminal judicial system. And while it can never be an easy task, it can only be assumed that it is extraordinarily more difficult when the offense involves the death of another human being. Despite how others may view the arguments made herein, both counsel and Mr. Teeple wish it clearly understood that they too acknowledge and mourn the death of Jason Farley. We understand that we cannot begin to know the profound pain and loss, as we saw expressed through the letters to the court, suffered by his children and family or the continuing desires for revenge and retribution.

2. Thankfully, society has developed and placed its trust and confidence in a system to peacefully deal with these most difficult events – the rule of law. However, it remains a difficult and yet profound responsibility – divining what sentence is just when a life is lost. What is sufficient, but not too much punishment? Does society need further protection? Will others hear about what is imposed and be suitably deterred? Are rehabilitative services necessary or appropriate? Counsel always knew when it was going to be a particularly tough sentencing day for a now-retired state court judge when he would begin by saying to my client: "You're not a bad person, its just that you did a bad thing." There can be not doubt that this is such a case. Counsel submits to the Court that Mr. Teeple is not a bad person, yet as even he readily admits he did a terribly bad thing!

3. Even now, over a year later, Mr. Teeple continues to have difficulty sorting out, understanding, and even describing the events of September 10, 2004. He and his wife, Jordana, had gone to the Rachel Gravelle residence late in the evening with the hope of meeting new friends and finally just becoming accepted into the Bay Mills Indian Community. But what would later happen along South Red Pine Lane would end one life and change the lives of all of the other participants forever! Everyone had been or was drinking. Multiple disputes arose and, as Mr. Teeple would later describe it, everything just kept escalating, it just did not stop and it happened so fast.[1] And when it was over, when this unfortunate string of seemingly unavoidable events had played out, one young man was dead and another was in police custody. [See: PSR, ¶¶7-15]

4. As he awaited police processing, I am certain Mr. Teeple reflected on how he came

1 Perhaps a good indication of the pandemonium going on that evening is the observations noted within the PSR that Mr. Teeple had beer thrown at him, had been kicked by one girl, and was later assaulted by another girl as he tried to leave (after she had already slashed several of his tires with her knife). [PSR, ¶¶8-10 and 13]

to be in this small Indian community in the eastern Upper Peninsula. Here he was, 27 years old, happily married for over four years with two small children. Just months earlier they had moved from New York state to live with his father at Bay Mills. He and Jordana were already enrolled in the local community college, hoping for a fresh start or as they put it: "to do something better with our lives." Since marrying they both had worked at his father-in-law's moving and storage company. He had also worked a second full-time job at a local adult foster care home. Their income records showed that their finances were now steadily improving, but Mr. Teeple wanted to provide his children with the upbringing, stability and security he never had. [See: PSR, ¶¶63-64 and 66]

5. Here he was in trouble, again. He had so wished that he had escaped all of that following his marriage to Jordana in the Summer of 2000. As a teenager he had first been charged with what everyone called incorrigibility. Later he had possessed drugs and had a traffic offense. The three shop-lifting charges and the one burglary now seemed so long ago, some almost ten years old. Still he had worked through that last felony problem and had had no contact with the law for several years.[2] [See: PSR, ¶¶36-43]

6. Sure, during those difficult years before he met Jordana and her family he had experimented with any number of different drugs. He had managed to stop using all of them by the time they married, except alcohol – it continued to be a problem. [See: PSR, ¶¶56-61] He had been drinking that evening and it probably contributed to what happened. Yet he recognized that he

---

2 In her request for an upward departure, AUSA Hagen emphasized that Mr. Teeple "began his criminal career" by assaulting his sister and failed "miserably" at probation. It is submitted that a more dispassionate evaluation of that criminal history would conclude that a clear lack of parental guidance and control led to these juvenile problems, and that since his marriage he was in "full compliance with his conditions of supervision" and was granted an early discharge. [PSR, ¶43]

controlled and was responsible for his actions. His drinking was certainly no excuse for what he had done. As he said:

> "I accept full responsibility for taking Jason Lyons' life, and I desperately wish I could go back to that night and take it all back." [PSR, ¶21]

7. So what was going to happen now? Originally indicted for second degree murder, Mr. Teeple was offered and accepted a plea to the offense of voluntary manslaughter – an offense he and counsel always believed was appropriate for his conduct that evening. On June 30, 2005, he again appeared before Magistrate-Judge Greeley and, in accordance with the plea agreement, entered a plea of guilty to the Felony Information – it alleged that on or about September 10, 2004, he "did unlawfully kill Jason T. Lyons, an Indian, by stabbing him in the chest and plunging a knife into his heart. In stabbing Mr. Lyons, the defendant acted without malice and upon a sudden quarrel or heat of passion" in violation of *18 USC §1112*.[3]

8. Probation Officer Lee Sharp has submitted his final draft of the PSR, along with his recommendations, to the Court. Using the 2003 edition of the Guidelines Manual, this offense results in a total offense level of "22" [PSR, ¶34]. Based upon this total offense level and a criminal history category of "II"[PSR, ¶44], the PSR recommends that the advisory guideline range that should be considered by this Court is a range of 46 to 57 months [PSR, ¶72]. Additionally, as a part of his recommendations to the Court, Mr. Sharp has proposed that Mr. Teeple receive a custodial sentence of 52 months – approximately in the middle of the guidelines as calculated.[4]

---

3 Arrested at the scene, Mr. Teeple has remained lodged since September 10, 2004.

4 While AUSA Hagen has argued that Mr. Teeple's unscored juvenile offenses require an upward adjustment of one criminal history category, it is significant that although this possibility was first recognized by Mr. Sharp, he did not even feel the need to recommend a sentence at the upper limit of the calculated guideline range. [PSR, ¶84]

9. Neither Mr. Teeple nor counsel dispute the guideline scoring. All parties understood that this would be the expected guideline range at the time the plea offer was made by the government and accepted by Mr. Teeple. We agreed to it then and we agree to it now.

10. What then is a reasonable sentence in this case? Contrary to the conclusion arrived at by the government, counsel believes that a thorough review of Mr. Teeple's entire history would lead to the conclusion that he is not an unusual risk for recidivism and that a sentence at the low-end of the guideline range (46 months) would be more appropriate and reasonable. Certainly, Mr. Teeple's juvenile history was not encouraging, but as he reached his early 20's he began to change and mature. This is something the former state court judge also repeatedly commented on – most juvenile defendants settled down and stopped committing crimes when they reached their early to mid-20s. Counsel believes that this favorable outlook for Mr. Teeple's future is supported by Jeffery T. Kielszewski, PhD, a licensed psychologist from Grand Rapids who interviewed Mr. Teeple and who will be called to testify by video-conferencing at the time of sentencing. Within the conclusions of his report, Dr. Kielszewski opined:

> "What is remarkable about Thomas' story is that he made a conscious decision to turn his life around. He began to refrain from drug use. He became actively employed. A turning point came when Thomas married at age 23. Given his personality that contains significant dependancy features, it is not surprising that this type of force in his life could help him to overcome his difficulties.
>
> * * *
>
> What is remarkable about Tom's story is that he was able to orchestrate a radical lifestyle change to be a more productive citizen. He was oriented and dedicated to his family through his lifestyle prior to incarceration. Unfortunately, due to the incident that has led to his legal difficulties, many of these plans were destroyed. Also, a man lost his life. Thomas recognizes this fact and holds remorse as well as a great deal of regret.
>
> * * *
>
> Assuming Thomas is convicted and serves prison time, from a clinical perspective, there is little data that would suggest that he would reemerge into society as anything

> less than a productive citizen. There is no personality disorder or orientation towards antisocial and criminal behavior that would indicate that he would change his lifestyle and personal orientation, contributing to societal problems if not incarcerated."

11. The *18 USC §3553(a)* factors that still need to be considered by the Court in its determination of a reasonable sentence also support the imposition of a low-end guidelines sentence. Of course, the nature of the offense, the characteristics of the defendant, the kinds of sentences available and the sentencing range have already been discussed. That leaves the traditional objectives of sentencing identified in *18 USC §3553(a)(2)*:

a. <u>Reflection of the seriousness of the offense and just punishment</u> – While there can be no more serious crime than that involving the loss of life, all parties elected to proceed with the understanding that Mr. Teeple's actions that evening constituted voluntary manslaughter. Once that decision was agreed to, there was no dispute that the resulting guideline range, without departures, would be 46 to 57 months. Although at the low-end, a 46-month sentence is both contemplated by the guidelines and reasonable under these circumstances.

b. <u>Deterrence of further criminal conduct</u> – Except for this single incident, Mr. Teeple has lived an exemplarily life since his marriage in 2000. Given the unconditioned support from his wife and her family, the likelihood that he will engage in this or any other type of criminal conduct in the future is remote! As he said:

> "I'm so sorry for what I've done. Certainly, I've never done anything like this before and I will never do it again. I regret the whole thing with all my heart. . . . When I'm able to go home, I will work as hard as I can in order to be a responsible man and lead a good life." [PSR, ¶21]

Because Captain Perron's victim impact letter to the court so clearly describes the significant impact this incident has already had on the Bay Mills Indian Community, it would now appear that this tragedy might already have had one beneficial consequence – the anticipated deterrence of other young people on the reservation from participating in these all-night parties where alcohol is constantly available, disagreements and disputes inevitably arise and knives are too close at hand.

c. Protection of society – Mr. Teeple had not been a significant threat to society as a juvenile; he was basically a petty thief. Yet, while he had changed his life for the better, there is no denying that he killed Mr. Lyons. However, this act was a sudden, unplanned occurrence resulting from intoxication and a series of unfortunate incidents, without which this incident might have been avoided. And while Mr. Teeple needs to be appropriately punished for what he did, it is submitted that the entire record indicates that there is no realistic likelihood of Mr. Teeple doing anything like this ever again.

d. Providing the defendant with needed rehabilitation – Although Dr. Kielszewski concluded that Mr. Teeple has no significant mental health issues, it is difficult to imagine that Mr. Teeple would not benefit from anger management or other similar counseling while incarcerated. He does, of course, still have continuing substance abuse issues that should also be addressed. Finally and in order to assist Mr. Teeple in his eventual readjustment to society, he would certainly benefit from vocational and other educational counseling (ironically the very benefit he had been hoping to obtain when he moved his family to Michigan).

12. The Court is well aware that the sentence that must be impose must be "sufficient, but not greater than necessary," [*18 USC §3553(a)*] and must also recognize that "imprisonment is not an appropriate means of promoting correction and rehabilitation." [*18 USC §3582(a)*] The guidelines the parties understood would be applicable in this case at the time of the entry of the plea and those same guidelines that are now outlined in the PSR satisfy both of these concerns. A sentence at the low-end of that range is sufficient punishment, while at the same time promoting correction and rehabilitation. When he met and married his wife in 2000, Mr. Teeple closed the door on his past. Except for this brief – but truly tragic – lapse in judgment and control, Mr. Teeple's adult history since that time had been similar to most hard working self-reliant young husbands and fathers. And there is every indication that, when given the opportunity, he will return as a productive member of society.

13. Finally, attached hereto is a 12½ minute DVD. It is presented to the Court for the purpose of supplementing the issues and arguments raised in this sentencing memorandum.

**WHEREFORE,** Mr. Teeple respectfully requests that this Honorable Court, at the time of sentencing:

a. order a reasonable period of incarceration not to exceed 46 months,[5]

b. recommend that during this period of incarceration he participation in the Federal Bureau of Prison's 500-Hour substance abuse treatment program, as well as any other available substance abuse, educational, and vocational counseling programs,

c. order a reasonable period of supervised release,

---

5 Mr. Teeple would also ask for the Court's consideration in recommending to the BOP that he be placed at a facility as to near to his family in New York state as possible.

d. order payment of the mandatory restitution[6] and waive the payment of any fine, and

e. order payment of the mandatory special assessment.

Respectfully submitted,

RAY KENT
Federal Public Defender

/s/ Paul A. Peterson
PAUL A. PETERSON
Assistant Federal Public Defender
100 North Front Street, Suite 104
Marquette, MI 49855
(906) 226-3050

Dated: December 14, 2005

O:\MARQUETTE\0-CLIENTS\Teeple, Thomas\6-Sentencing\Memorandum.wpd

6 Mr. Lyon's mother expressed concern that her request for restitution might be viewed as "petty." She should be assuaged that it is not.